UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X     For Online Publication Only
RANA ROMNEY,

        Plaintiff,     **MEMORANDUM &**
              **ORDER**
  -against-         14-CV-4512 (JMA) (SIL)

MICHAEL J. BLACK, WILLIAM HUDSON, JR.,
individually and as a police detective of the Suffolk
County, N.Y. Police Dep't, COUNTY OF SUFFOLK

        Defendants.
-------------------------------------------------------------------X

**APPEARANCES:**

 Arthur V. Graseck, Jr.
 95 Meredith Lane
 Oakdale, New York 11769
  *Attorney for Plaintiff*

 Jack Piana
 Piana & Gioe
 1200 Veterans Memorial Highway 360
 Hauppauge, New York 11788
  *Attorney for Defendant Michael J. Black*

 Kyle O. Wood
 Suffolk County Department of Law
 100 Veterans Memorial Highway PO Box 6100
 Hauppauge, New York 11788
  *Attorney for Defendants William Hudson, Jr. and County of Suffolk*

 Susan A. Flynn
 Suffolk County Attorney's Office
 H. Lee Dennison Building
 100 Veterans Memorial Highway
 Hauppauge, New York 11788
  *Attorney for Defendant County of Suffolk*

**AZRACK, United States District Judge:**

Plaintiff Rana Romney brings this action against defendants Michael Black, Detective William Hudson, and the County of Suffolk (the "County") alleging federal claims of false arrest and malicious prosecution. Romney also brings a malicious prosecution claim under state law against Black. Hudson and the County have moved for summary judgment on the federal claims. For the reasons stated below, the Court grants defendants' motion for summary judgment. Furthermore, even though defendant Black has not joined the motion for summary judgment, the Court's findings with regard to Hudson and the County necessarily require dismissal of the federal claims against Black. Accordingly, all of plaintiffs' federal claims are dismissed. Having disposed of the federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state law claim against Black.

## I.  BACKGROUND

On August 26, 2011, plaintiff Rana Romney was arrested and charged with assault in the first and second degrees in connection with the beating and stabbing of her ex-boyfriend, defendant Michael Black, on August 12, 2011. (Defs.' 56.1 Statement ¶¶ 1, 9, 16, 18, ECF No. 33-20.)[1]

**A. The Assault**

On the evening of August 12, 2011, Romney called Black and asked him to come to her house in West Babylon to help take care of their infant daughter. (Id. ¶ 9.) As Black was driving to Romney's house in his Nissan, he received a call from his current girlfriend, Elizabeth Chin. (Id. ¶ 10.) Chin informed Black that a light colored Jeep had followed him as he left for Romney's.

---

[1] Defendants submitted a statement of material facts pursuant to Rule 56.1 in support of their motion for summary judgment. (Defs.' 56.1 Statement, ECF No. 33-20.) In response, plaintiff submitted a counter statement of facts. (Pl.'s 56.1 Statement, ECF No. 33-23.) The Court cites to these statements only to the extent they state facts that are not in dispute and the particular paragraph at issue is supported by the record evidence cited therein. The Court notes that neither party has objected to the admissibility of any of the evidence cited in the opposing party's 56.1 Statement.

2

(Id.)  Black also observed a silver Jeep, which followed him as he drove down the Southern State Parkway.  (Id. ¶ 11.)  By the time Black turned onto Romney's street, he believed he had lost the Jeep.  (Id.)  As Black exited his car to walk to Romney's house, the Jeep pulled up.  (Id.)  Three men exited the Jeep and proceeded to attack him.  (Id.)

At some point, Black was stabbed in the chest.  (Id. ¶ 2.)  As discussed below, it is unclear who stabbed Black and when exactly this occurred.  Also, at some point, Black entered Romney's house and confronted her about the assault, accusing her of arranging it.  (Id. ¶ 3.)  After the confrontation, Black ran to the house of Kristina Krzenski, one of Romney's neighbors.  (Id. ¶ 7.)  Black was subsequently transported from Krzenski's house to Good Samaritan Hospital, where he was diagnosed with a collapsed lung.  (Id. ¶¶ 2, 12.)

**B.  The Investigation**

Defendant Detective Hudson was dispatched to Romney's house on the evening of August 12, 2011.  (Id. ¶ 1.)  Hudson, however, did not arrive until after Black was transported to Good Samaritan Hospital.  (Id. ¶ 2; Excerpted Testimony of William Hudson 6:11–20; 7:12–15, Wood Aff. Ex. B, ECF No. 33-4.)  When he arrived, Hudson was informed by an on-scene officer, Officer Paul DiCostanzo, that Black had been stabbed "[a]nd that the suspects may have been three black males occupying a silver Jeep."  (Id. 6:11–20.)  At some point, according to an incident report prepared by Officer DiCostanzo, Black had reported to an investigating officer that "3 UNK BLACK MALES BEAT HIM AND STABBED HIM IN HIS CHEST AND HEAD."  (SCPD Incident Report, Romney Aff. Ex. 1, ECF No. 33-25.)  It is not clear from the record whether this statement was ever communicated to Hudson.

After his on-scene briefing, Hudson interviewed Romney.  (Defs.' 56.1 Statement ¶ 3.)  Romney told Hudson her version of events and attested to the same in a sworn statement.

3

According to Romney,

> On the evening of August 12, 2011, Romney called Black and asked him to come to her house to help care for their infant child. The first Romney heard from Black after speaking with him on the phone, was banging on her front door a few minutes after 10:59 P.M. Romney got dressed and answered the door. Black "rushed inside," but was followed by at least two men who forced their way into Romney's home. After kicking a hole through Romney's wall, the men started beating Black. At this point, Romney was pushed down some stairs and could not clearly see the attack or the assailants. Suddenly, the men ran out of the house, leaving Black behind. Somehow, Romney and Black ended up at the top of a different set of stairs. Upon being confronted by Black, Romney denied knowing who the assailants were.

(Romney Sworn Statement dated August 12, 2011, Wood Aff. Ex. C, ECF No. 33-5.) Romney did not provide Hudson with any information indicating that Black was stabbed. Also, the record does not reflect that she took any position on what time Black was stabbed, or by whom.

The next day, August 13, 2011, police located the silver Jeep allegedly used in the assault of Black. (Defs.' 56.1 Statement ¶ 5.) The officer who located the Jeep advised Detective Hudson that it had been rented from an Enterprise in Hicksville, New York. (Id.) Hudson went to the rental facility and obtained the rental contract for the Jeep. (Id.) The contract listed Romney as the renter. (Id.; Enterprise Rental Agreement, Wood Aff. Ex. F, ECF No. 33-8.)

Also, at some point on August 13, 2011, Black's Nissan, which he had used to drive to Romney's the day before, was reported as stolen. (Conversation Listing, Romney Aff. Ex. 8, ECF No. 33-32; Grand Larceny Incident Report, Romney Aff. Ex. 9, ECF No. 33-33.) It is not clear from the record who reported the car stolen.

On August 14, 2011, Detective Hudson returned to Romney's neighborhood to re-canvass the area. (Defs.' 56.1 Statement ¶ 7.) Krzenski, Romney's neighbor, provided a sworn statement to Hudson, in which she stated the following:

> On August 12, 2011, at around 11:00 P.M., Krzenski heard several knocks at her front door. When she answered the door, she saw Black, who was bleeding from

4

> the chest. Black asked her to call 911. Krzenski left to get her husband and call 911. When she returned to her front door, she saw Black driving off in his car. Several minutes later, she observed Black walking back towards her house, out of breath and "in need of help." Black then laid down on her front stoop, where he stayed until the police and ambulance arrived.

(Krzenski Sworn Statement dated August 14, 2011, Wood Aff. Ex. I, ECF No. 33-11.)

Later that day, Hudson travelled to Good Samaritan Hospital and interviewed Black. According to Black:

> On the evening of August 12, 2011, Black was followed by a silver Jeep as he drove his Nissan to Romney's house. Once he arrived, three men exited the Jeep and started beating him with sticks. Black ran to Romney's house and banged on the door. Eventually, Romney answered the door and let him inside. At this point, the men left. Once Black was inside Romney's house, she ran up the stairs. Black confronted her and asked "Why did you set me up, you had three guys beat the father of your baby?" Romney replied: "You had my daughter with that bitch [i.e., Chin]," and "You motherfucker, you motherfucker." Black then walked up the stairs and asked Romney again "Why did you have me set up?" In response, Romney lunged forward, stabbed Black in the chest with an ice pick, and said "You're going down, motherfucker." At this point, Black ran out of the house.

(Black Sworn Statement dated August 14, 2011, Wood Aff. Ex. J, ECF No. 33-12.) Also during the interview with Hudson, Black admitted that his Nissan had not been stolen. (Grand Larceny Incident Report, Romney Aff. Ex. 9.) Rather, after asking Krzenski to call 911 on August 12, 2011, he had decided to drive his car and park it a few blocks away from Romney's home "for safekeeping," and because he was not thinking clearly "as a result of him possibly being in shock from the stabbing." (Assault Incident Report; Romney Aff. Ex. 10, ECF No. 33-34; Grand Larceny Incident Report, Romney Aff. Ex. 9.)

That same day, the police located and impounded Black's Nissan. (Romney Aff. ¶ 22, ECF No. 33.) Upon inspection, the police found several license plates, wigs, and what appeared to be drugs inside the car. (Id.)

5

## C. <u>The Arrest and Interrogation</u>

On August 26, 2011, Romney arrived at the First Precinct police station in connection with a custody proceeding. (Assault Incident Report, Romney Aff. Ex. 10.) Once Romney arrived, Hudson placed her under arrest for the August 12, 2011 assault of Black. (<u>Id.</u>) Romney was read her <u>Miranda</u> rights. (Prosecution Worksheet, Wood Aff. Ex. N, ECF No. 33-16.) Romney initially waived her rights, and Hudson proceeded to interrogate her.[2] (<u>Id.</u>; Rules of Interrogation Card, Wood Aff. Ex. M., ECF No. 33-15; Assault Incident Report, Romney Aff. Ex. 10.) Hudson asked Romney to describe the circumstances surrounding the assault. (Defs.' 56.1 Statement ¶ 17.) Romney responded that whatever she said in her initial statement on the evening of August 12, 2011, was what happened. (<u>Id.</u>) When asked if she had an independent recollection of the events, she responded that she did not. (<u>Id.</u>) Hudson then asked about the three men and silver Jeep, to which Romney replied, "What Jeep?" (<u>Id.</u>) Hudson continued, "The Jeep you rented." (<u>Id.</u>) At this point, Romney invoked her right to counsel and the questioning stopped. (<u>Id.</u>)

## D. <u>The Prosecution and Acquittal</u>

On September 6, 2011, Romney was indicted by a grand jury in Suffolk County for assault in the first and second degrees. (Indictment, Wood Aff. Ex. O, ECF No. 33-17.) On October 31, 2012, Judge Gary Weber held a <u>Huntley</u> hearing to determine the admissibility of the statements that Romney made to Hudson on August 12, 2011, and August 26, 2011. (Defs.' 56.1 Statement ¶ 19.) By order dated November 2, 2012, Judge Weber determined that all of Romney's statements were admissible at trial. (<u>Id.</u>)

On June 17, 2013, Assistant District Attorney John Cortes ("ADA Cortes") met with

---

[2] In her 56.1 Statement, Romney asserts, in conclusory fashion, that she was never read her <u>Miranda</u> rights and that Hudson forged her initials on the card where she was meant to indicate that she had been read and understood her rights. Romney, however, fails to provide any evidentiary support for this allegation. Accordingly, the Court disregards her unfounded accusations.

6

Emergency Medical Technician Michelle Barra ("EMT Barra").  (Letter from ADA Cortes to Defense Counsel, Romney Aff. Ex. 4, ECF No. 33-28.)  EMT Barra had transported Black from Krzenski's stoop to the hospital on the night of August 12, 2011.  Barra informed ADA Cortes that as she was rendering emergency care to Black, Black advised her that he had been stabbed by a man while watching television with a friend.  (Id.)  Barra also reported that Black told her: "She did this. This is because of her."  (Id.)  The next day, ADA Cortes advised defense counsel of the encounter with Barra via letter.  (Id.)

Romney was tried before a jury in July 2013.  The jury acquitted her later that month.

### E. Black's Criminal History

Plaintiff has also introduced court and police records, which show that Black has an extensive criminal history.  (Romney Aff. Ex. 6, ECF No. 33-30.)  Defendants have not challenged the admissibility of these submissions.  Accordingly, the Court assumes that, at the time of the assault, Black had multiple convictions for, among other things, criminal possession of a weapon and possession of stolen property.  (Id.)  Additionally, at the time of the assault, Romney had already filed at least one report against Black for domestic violence and had obtained multiple orders of protection against him.  (Id.)

### F. Procedural History

Romney filed the instant case against Black, Hudson, and the County on July 28, 2014. Plaintiff alleges, inter alia, that defendants violated her constitutional rights when they allegedly (1) arrested her without probable cause on August 26, 2011 and (2) maliciously prosecuted her for the assault of Black.  Defendants Hudson and the County have moved for summary judgment on these claims.  In opposition, plaintiff has filed (1) a three-page 56.1 Counter Statement, devoid of any citations to the record, (2) a four-page affidavit, which contains citations to the record, and (3)

7

ten exhibits. Plaintiff has not filed a memorandum of law in opposition to the motion.

## II. DISCUSSION

### A. Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). The movant bears the burden of demonstrating that "no genuine issue of material fact exists." Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'" Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . ." Marvel Characters, 310 F.3d at 286 (citing Matsushita, 475 U.S. at 587; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)). To defeat a properly supported motion for summary judgment, "the non[-]moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (emphasis in original) (quoting Fed. R. Civ. P. 56(e)). The non-moving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586 (citations omitted). Mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment. See

8

Shannon v. N.Y.C. Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003). Unless the non-moving party produces significant probative evidence demonstrating that a factual dispute exists, summary judgment is appropriate. Anderson, 477 U.S. at 249.

"[A] court considering a summary judgment motion in a false-arrest or malicious-prosecution case must construe in favor of the non-moving party any factual disputes regarding what circumstances were known to the officer at the relevant time." Benn v. Kissane, 510 F. App'x 34, 37 (2d Cir. 2013). "After that, however, the court must undertake a neutral, legal analysis of whether those (assumed) circumstances satisfy the probable-cause standard." Id. (citing Jenkins v. City of New York, 478 F.3d 76, 88 (2d Cir. 2007)). "In other words, the court should resolve in favor of the non-moving party any disputes about what information the officer knew, but it should neutrally determine whether that information gave rise to probable cause." Id. (emphasis in original).

## B. Standard for 42 U.S.C. § 1983 Claims

"To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999).

To state a claim for municipal liability, plaintiffs must allege "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007) (quoting Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983)); see also Monell v. Dep't of Soc. Servs. of N.Y.C., 436 U.S. 658, 694–95 (1978). Municipal liability is "an extension of liability, not an independent cause of action, and therefore requires an underlying constitutional violation." Soto v. City of New York, 132 F. Supp.

9

3d 424, 459 (E.D.N.Y. 2015) (citing Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006)).

Ordinarily, § 1983 claims are brought against state officials. Singer v. Fulton Cty. Sheriff, 63 F.3d 110, 119 (2d Cir. 1995). A plaintiff, however, may establish that a private citizen is liable under § 1983, if the plaintiff "shows sufficient state involvement in the action in question to trigger constitutional protections." Cunningham v. Southlake Ctr. for Mental Health, Inc., 924 F.2d 106, 107 (7th Cir. 1991) (citing Nat'l Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179, 192 (1988)); see also Bang v. Utopia Rest., 923 F. Supp. 46, 49 (S.D.N.Y. 1996) (citing Cunningham, 924 F.2d at 107–08). A plaintiff satisfies the "color of state law" element of a § 1983 claim if the plaintiff proves either: "(1) the existence of joint activity between the private actor and the state or its agents, or (2) a conspiracy between the state or its agents and the private actor." Young v. Suffolk Cty., 922 F. Supp. 2d 368, 385 (E.D.N.Y. 2013). "To establish joint action, a plaintiff must show that the private citizen and the state official shared a common unlawful goal; the true state actor and the jointly acting private party must agree to deprive the plaintiff of rights guaranteed by federal law." Anilao v. Spota, 774 F. Supp. 2d 457, 498 (E.D.N.Y. 2011) (quoting Bang, 923 F. Supp. at 49). Alternatively, to show that there was a conspiracy between a private actor and the state or its agents, a plaintiff must provide evidence of "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Fisk v. Letterman, 401 F. Supp. 2d 362, 376 (S.D.N.Y. 2005) (quoting Ciambriello v. Cty. of Nassau, 292 F.3d 307, 324–25 (2d Cir. 2002)). While proof of joint action or conspiracy satisfies the "color of state law" element of § 1983, in order to establish a private citizen's liability, a plaintiff must still establish an underlying deprivation of constitutional rights. Anilao, 774 F. Supp. 2d at 497 (distinguishing the two elements of a § 1983 claim and noting that, upon establishing a constitutional deprivation, the

10

question becomes whether that deprivation is attributable to the state).

The Court addresses each of plaintiff's claims in turn.

## C. Hudson's Liability for False Arrest

Defendants argue that plaintiff has failed to establish a federal claim for false arrest against Hudson. The Court agrees.

### 1. Standard

A plaintiff cannot prevail on a claim for false arrest if the defendant had probable cause to arrest the plaintiff. Jaegly v. Couch, 439 F.3d 149, 151–52 (2d Cir. 2006). The Court assumes arguendo that defendants bear the burden of proving that there was probable cause for plaintiff's arrest. Blau v. Suffolk Cty., No. 11-CV-4818, 2016 WL 426515, at *3 (E.D.N.Y. Feb. 3, 2016).

Probable cause exists where "the arresting officer [has] knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000) (quoting Singer, 63 F.3d at 119). A court evaluates the existence of probable cause in light of the totality of the circumstances. Kent v. Katz, 312 F.3d 568, 576 (2d Cir. 2002).

"Under federal law, a police officer is entitled to qualified immunity where '(1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act.'" Jenkins, 478 F.3d at 87 (quoting Cerrone v. Brown, 246 F.3d 194, 199 (2d Cir. 2001)). The critical inquiry here is whether Hudson's determination that he had probable cause to arrest plaintiff was objectively reasonable. "An officer's determination is objectively reasonable if there was 'arguable' probable cause at the time of the arrest—that is, if 'officers of reasonable competence could disagree on whether the probable cause

11

test was met.'"  Id. (quoting Lennon v. Miller, 66 F.3d 416, 423–24 (2d Cir. 1995)); see also Malley v. Briggs, 475 U.S. 335, 341 (1986) ("[Qualified immunity] provides ample protection to all but the plainly incompetent or those who knowingly violate the law.").  To determine whether an officer's conduct was objectively reasonable, a court considers the information available to the officer at the time of the arrest and does not inquire into the officer's subjective intent.  Caldarola v. Calabrese, 298 F.3d 156, 162 (2d Cir. 2002); Conn. ex rel. Blumenthal v. Crotty, 346 F.3d 84, 106 (2d Cir. 2003).

### 2. Analysis

Plaintiff appears to argue—although it is far from clear given her failure to file an opposition brief—that Black's sworn statement on August 14, 2011, cannot serve as a basis for Hudson's probable cause determination because it was given under circumstances that raised doubts as to Black's veracity.  In particular, she contends that no reasonable officer could have found probable cause to arrest given:  (1) the inconsistency between Black's statement to investigating officers on scene and his later sworn statement; (2) Black's criminal history; and (3) Black's suspicious behavior regarding his Nissan.  Plaintiff also argues that EMT Barra's statements would have led a reasonable officer to investigate further and, thus, preclude a finding of probable cause.  The Court disagrees.  Not only did Black's sworn statement, alone, establish probable cause that plaintiff was involved in the assault, but Black's sworn statement coupled with the evidence showing that plaintiff rented the Jeep used in the assault undoubtedly established probable cause.  Even if the Court were to find that these circumstances did not definitively establish probable cause, Hudson would be entitled to qualified immunity because the Court cannot say that Hudson's determination of probable cause in light of Black's sworn statement and the circumstantial evidence regarding the Jeep was objectively unreasonable.

First the Court notes that it was not necessary for Hudson to have probable cause to suspect that plaintiff actually stabbed Black, herself. If Hudson had information, which would have led a competent officer to believe that plaintiff was involved in any stage of the assault, then Hudson had probable cause to arrest plaintiff.

Second, absent circumstances that raised doubts as to Black's veracity, Hudson was entitled to rely on Black's sworn statement dated August 14, 2011, which implicated plaintiff in the August 12, 2011 assault. "'[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness,' unless the circumstances raise doubt as to the person's veracity." Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (quoting Martinez, 202 F.3d at 634 and citing Singer, 63 F.3d at 119). It is also reasonable for an officer to rely on the sworn statements made by private citizens under penalty of perjury. See id. at 397. Plaintiff does not dispute this standard, but rather, appears to argue that several factors would have led a reasonable police officer to doubt Black's sworn statement.

First, plaintiff suggests that Black's on-the-scene statement memorialized in the police report (in which he states that he was stabbed by three unknown males) is inconsistent with his later sworn statement (in which he states that he was stabbed by plaintiff). Plaintiff, however, fails to cite any authority for the proposition that a single inconsistent statement made by an eyewitness undermines his or her credibility. In fact, the law appears to be to the contrary. Courts in this Circuit regularly find that police officers had probable cause to arrest despite inconsistent statements given by eyewitnesses. See O'Brien v. City of Yonkers, No. 07-CV-3974, 2013 WL 1234966, at *10 (S.D.N.Y. Mar. 22, 2013) (collecting cases in which witnesses' statements contributed to probable cause determination despite inconsistencies in those statements). A similar

13

finding is especially warranted here, where the statement implicating plaintiff was made under penalty of perjury and the earlier, allegedly inconsistent statement was made on scene, shortly after the victim had been stabbed, during the chaos of the unfolding investigation. See Krause v. Bennett, 887 F.2d 362, 372 (2d Cir. 1989) ("Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury. Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence.").

Plaintiff next attempts to argue that a competent officer would have questioned Black's veracity given his criminal history, in particular his history of violence against the plaintiff. Intertwined with this argument is plaintiff's suggestion that Black was motivated to implicate her in the crime because of an ongoing custody dispute over their infant child. These arguments are meritless. Oftentimes, the only eyewitnesses to domestic violence are the assailant and his or her victims. If police were obligated to discredit a victim's account of the events solely because of acrimonious history between the parties, these violent crimes would go virtually unprosecuted. One Circuit court has already rejected this proposition as untenable. See United States v. Patane, 304 F.3d 1013, 1017 (10th Cir. 2002), rv'd on other grounds, 542 U.S. 630 (2004). "[T]he fact that a victim may be entangled in a domestic dispute does not, in and of itself undermine the victim's veracity." Weiner v. McKeefery, 90 F. Supp. 3d 17, 30–31 (E.D.N.Y. 2015) (involving both martial and custody disputes and citing Patane and other cases). In other words, "[there is] no basis for the suggestion that domestic violence victims are undeserving of the presumption of veracity accorded other victim-witnesses." Id. (quoting Patane, 304 F.3d at 1017).

Plaintiff also submits that Black's suspicious behavior regarding his car undermines his credibility and, thus, negates any finding of probable cause based on his sworn statement. Plaintiff

14

again fails to cite any authority in support of this theory. Black's behavior, although admittedly suspicious, would not necessarily lead a competent officer to discount his identification of the person who stabbed him. For instance, a reasonable officer could have believed Black's explanation that he moved his car because he was not thinking clearly "as a result of him possibly being in shock from the stabbing." Alternatively, a competent officer could have determined that Black had moved his car so that the police would not discover the possibly inculpatory items in it. Neither of these explanations necessarily implicate the August 12, 2011 assault or Black's ability to recount it truthfully.

Even if a competent officer would have questioned Black's veracity in light of the above, the evidence linking plaintiff to the Jeep used in the assault could have led that same officer to conclude that plaintiff was involved in some aspect of the assault, possibly as an aider and abettor.

Plaintiff also suggests that EMT Barra's "exculpatory" statements triggered a duty for Detective Hudson to investigate further and thus, undermined his probable cause determination. The Court disagrees.

First, plaintiff fails to establish that Detective Hudson knew or should have known about Barra's statements, which were made to an ADA and communicated to defense counsel almost two years after plaintiff's arrest. Critically, there is no evidence that Hudson had knowledge of Barra's statements before the arrest. Thus, Barra's statements are irrelevant to the false arrest inquiry. Second, contrary to plaintiff's suggestion, even if Hudson had been aware of Barra's statement, that evidence would not have undermined probable cause because Barra's statements were not exculpatory. At most, Barra's statements establish that Black was physically stabbed by someone other than plaintiff and reveal some inconsistencies in Black's version of events. However, a reasonable interpretation of Black's statements to Barra still implicates plaintiff in the

15

assault, possibly as an aider and abettor. (See Letter from ADA Cortes to Defense Counsel, Romney Aff. Ex. 4 ("She did this. This is because of her.").) Lastly, even assuming Hudson knew about Barra's statements and Barra's statements could be construed as exculpatory, Hudson would not have been under any duty to develop them further. "[O]nce a police officer has a reasonable basis for probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." Curley v. Vill. Of Suffern, 268 F.3d 65, 70 (2d Cir. 2001).

The Court concludes that Hudson had probable cause to arrest plaintiff based on Black's sworn statement, alone. Furthermore, Hudson clearly had probable cause to arrest plaintiff based on Black's sworn statement coupled with the circumstantial evidence of plaintiff's involvement in the Jeep rental. And, at the very least, Hudson had arguable probable cause to arrest. In other words, the Court cannot say that Hudson's determination that plaintiff was in some way involved in the assault was objectively unreasonable. Accordingly, the Court grants defendants' motion for summary judgment and dismisses the false arrest claim against Hudson.

### D. Hudson's Liability for Malicious Prosecution

Defendants argue that plaintiff has failed to establish a federal claim for malicious prosecution against Hudson. The Court agrees.

**1. Standard**

To survive summary judgment on a malicious prosecution claim, a plaintiff must demonstrate: "(1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice." Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003) (quoting Colon v. City of New York, 60 N.Y.2d 78, 82 (1983)). The existence of probable cause is a complete defense to a claim of malicious prosecution. Id. (citing Colon, 60 N.Y.2d at 82).

16

"[I]ndictment by a grand jury creates a presumption of probable cause that may only be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" Id. (emphasis in original) (quoting Colon, 60 N.Y.2d at 83). Negligence in an investigation or sloppy police work does not rise to the level of misconduct sufficient to rebut the presumption. Gil v. Cty. of Suffolk, 590 F. Supp. 2d 360, 370 (E.D.N.Y. 2008) ("Any alleged failure to conduct further investigation or apply all procedures that could have been followed does not amount to fraud, bad faith, or the suppression of evidence and is insufficient to overcome the presumption." (citing Colon, 60 N.Y.2d at 83, Lee v. City of Mount Vernon, 49 N.Y.2d 1041 (1980), & Santiago v. City of Rochester, 796 N.Y.S.2d 811, 812 (App. Div. 4th Dep't 2005))); Richards v. City of New York, No. 97-CV-7990, 2003 WL 21036365, at *16 (S.D.N.Y. May 7, 2003) ("[T]he police are not obligated to pursue every lead that may yield evidence beneficial to the accused, even though they had knowledge of the lead and the capacity to investigate it." (citing Gisondi v. Town of Harrison, 72 N.Y.2d 280, 285 (1988))). Moreover, "where a plaintiff offers merely his version of events . . . , this is nothing more than 'mere conjecture and surmise that [the plaintiff's] indictment was procured as a result of conduct undertaken by the defendants in bad faith,'" which is insufficient to rebut the presumption. Soto, 132 F. Supp. 3d at 456 (quoting Savino, 331 F.3d at 73).

**2. Analysis**

Plaintiff appears to argue, although it is far from clear given her sparse and conclusory papers, that Hudson is liable for malicious prosecution because he lied to the grand jury. The Court disagrees. There is absolutely nothing in the record, other than conclusory assertions made by plaintiff in her complaint, to suggest that Hudson lied during his grand jury testimony.

Plaintiff also appears to argue that Hudson is liable for malicious prosecution because he

17

purportedly had a duty to investigate EMT Barra's statements to ADA Cortes, but failed to do so. Plaintiff contends that Barra's statements are exculpatory and thus, merited further investigation. The Court disagrees. There is no evidence that Hudson ever knew about Barra's statement. And, a failure to adequately investigate cannot rebut the presumption of probable cause. See Gil, 590 F. Supp. 2d at 370 (citing Colon, 60 N.Y.2d at 83; Lee, 49 N.Y.2d 1041; Santiago, 796 N.Y.S.2d at 812).

Plaintiff also raises the specter of misconduct concerning plaintiff's post-arrest interrogation. There is, however, no evidence of misconduct in the record.

Ultimately, all of plaintiff's arguments are nothing more than "mere conjecture and surmise," which are insufficient to rebut the presumption of probable cause created by the grand jury indictment. Accordingly, the Court grants the motion for summary judgment on plaintiff's malicious prosecution claim against Hudson.

### E. Municipal Liability

To defeat summary judgment on a claim for municipal liability, a plaintiff must show "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Torraco v. Port Auth. of N.Y. and N.J., 615 F.3d 129, 140 (2d Cir. 2010) (citation omitted); see also Monell, 436 U.S. at 694–95. Municipal liability is "an extension of liability, not an independent cause of action . . . ." Soto, 132 F. Supp. 3d at 459 (citing Segal, 459 F.3d at 219). Therefore, in order to establish liability under Monell, plaintiff must first establish an underlying constitutional violation.

Because plaintiff has failed to establish any underlying constitutional violation by Hudson, there can be no municipal liability. Furthermore, plaintiff has failed to establish a single policy, practice, or custom promulgated by Suffolk County that could have caused the alleged violations

18

of plaintiff's constitutional rights. Thus, the Court grants defendants' motion and dismisses plaintiff's false arrest and malicious prosecution claims against the County.

**F. Black's Liability on the Federal Claims**

To establish Black's liability under § 1983, plaintiff must show state action through the joint action or conspiracy doctrines and an underlying deprivation of her constitutional rights. Anilao, 774 F. Supp. 2d at 497. Because plaintiff has failed to establish any underlying constitutional violation, Black cannot be liable under § 1983 as a private citizen. Accordingly, the Court dismisses the federal false arrest and malicious prosecution claims against Black.

**G. The State Malicious Prosecution Claim**

Having addressed plaintiff's federal claims, the Court now addresses plaintiff's remaining state law claim in which she contends that Black maliciously prosecuted her under state law.

The Court declines to exercise supplemental jurisdiction over this claim and dismisses it without prejudice. Plaintiff alleges that the Court has supplemental jurisdiction over this claim based on 28 U.S.C. § 1367. Without federal claims as an anchor, however, the Court declines to exercise supplemental jurisdiction over the remaining state law claim. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."); Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.").

### III.  CONCLUSION

For the reasons stated above, the Court grants defendants' motion for summary judgment on the false arrest and malicious prosecution claims against Hudson and the County.  Because Black's liability on the federal claims turns on the existence of a constitutional deprivation—and because no such deprivation exists here—the Court also dismisses these claims as to Black. Finally, the Court declines to exercise supplemental jurisdiction over the state law malicious prosecution claim.

The Clerk of Court is directed to close this case.

**SO ORDERED**.

Date:   March 31, 2017
        Central Islip, New York

                                                              /s/ (JMA)
                                                      Joan M. Azrack
                                                      United States District Judge